UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

YVETTE N. HARRISON,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 2:24-CV-320 JD

**OPINION AND ORDER**

Plaintiff Yvette Harrison appeals the denial of her claims for disability insurance benefits under Title II and Title XVI of the Social Security Act. For the reasons below, the Court will remand this case to the Agency for additional consideration.

**A. Procedural Background**

Ms. Harrison initially filed an application for disability insurance benefits in August 2021. The claim was denied about a year later, culminating in an appeal to the district court and a stipulated remand. On remand, Administrative Law Judge ("ALJ") Dina LaMarche held a new hearing and subsequently issued another unfavorable decision. Ms. Harrison then filed the present appeal. She did not seek review of the ALJ's decision by the Appeals Council, and the Appeals Council did not otherwise assume jurisdiction. Accordingly, the ALJ's decision constitutes the final decision of the Commissioner, subject to judicial review under 42 U.S.C. § 405(g). *See* 20 C.F.R. § 404.984 (establishing procedures for federal court remand cases).

**B. Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Still the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant and the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

C. **Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). The claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses

the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

### D. The ALJ's Decision

Ms. Harrison filed a Title II and Title XVI application for disability benefits alleging disability beginning on February 9, 2020. In finding that Ms. Harrison wasn't disabled, the ALJ employed the customary five-step analysis. At step two, she found that Ms. Harrison suffered from the following severe impairments: "status post compound right ankle fracture with open reduction and internal fixation; right ankle hardware removal; right ankle degenerative joint disease; post traumatic right ankle arthritis; acquired equinus deformity of the right foot; high blood pressure and obesity." (R. at 1662.) At step three, the ALJ concluded that Ms. Harrison "does not have an impairment or impairments or combination of impairments that meets or medically equals the severity of [a Listing]." (R. at 1663.)

At the hearing Ms. Harrison testified that she had a car accident in January 2016, severely injuring her ankle. Her last surgery was in 2017 to remove the hardware from the ankle. (R. at 1698.) Her podiatrist has recommended total ankle replacement. However, she has not pursued the surgery due to a lack of help in caring for her two-year-old daughter and concerns, based on her podiatrist's explanation, that multiple future surgeries might be necessary and that a

4

successful outcome was not guaranteed.[1] Her doctor estimated surgical recovery would take about six months. (R. at 1698–99.) She was given an ankle brace but she said she can't wear it due to swelling, discomfort, and pain. (*Id*.) She also tried a CAM boot, which did not fit even after adjusting, and was told there were no alternative stabilization options. According to Ms. Harrison, wraps do not help, as any compression causes further swelling and throbbing pain. (R. at 1700–01.)

Ms. Harrison's mother bought her crutches, which she now uses. She finds crutches more comfortable than a cane because they support more weight and help on days when she can't put weight on her foot. She often uses both crutches, especially as her condition has worsened since the last hearing. (R. at 1701–02.) She said she's been using crutches almost daily for the last four to six months, especially when doing basic tasks at home or going out. At the store, she uses electric scooters if available or brings both crutches; her son assists her by pushing the cart. (R. at 1704–05.)

Ms. Harrison reported constant ankle pain. She is prescribed only Ibuprofen, which she does not like to take and does not find it helpful. She has received cortisone shots, which last only about five days. (R. at 1703–04.) She testified that her pain on bad days (about four times per week) is at 8–9 out of 10; after Ibuprofen, the pain is around 5. (R. at 1714.) According to Ms. Harrison, she manages pain by constantly changing positions: she cannot sit, stand, or walk for prolonged periods and must switch between activities throughout the day. (R. at 1704–05, 1715–16.)

---

[1] A visit summary from Dr. Clinton Scott states that a success rate for total ankle replacement for a person of Harrison's age and condition is "roughly 80 percent but not as great as knee/ hip surgery." (R. at 2140.)

In her decision, the ALJ agreed that Ms. Harrison's medical condition could cause the symptoms she described. Even so, she concluded that her statements about the severity, persistence, and limiting effects of those symptoms were not fully consistent with the medical and other evidence in the record.

Among other things, in assessing Ms. Harrison's residual functional capacity ("RFC"), the ALJ considered the medical opinion of her treating podiatrist, Dr. Jesse Murphy. A visit note from March 7, 2023, states that she had been treated with a steroid injection the month before. (R. at 1079.) Dr. Murphy observed an "antalgic gait" and the use of "standard crutches." (*Id.*) He also commented that the "brace [was] well constructed" but that she had "difficulty wearing [it] with edema." (*Id.*) In addition, Dr. Murphy indicated that Ms. Harrison "[w]ill eventually require arthrodesis or TAA." (*Id.*)

On the same day, Dr. Murphy completed a physical residual functional capacity questionnaire. (R. at 2083.) He reported "severe" right ankle arthritis with a "guarded" prognosis. (*Id.*) He described symptoms of constant pain and stiffness, along with objective findings of diminished range of motion and popping in the ankle joint. (*Id.*) Dr. Murphy further stated that the brace, injections, NSAIDs, and crutches were not helping. (*Id.*) When asked how often during a typical workday Ms. Harrison's "pain and other symptoms would be severe enough to interfere with attention and concentration needed to perform even simple work tasks," Dr. Murphy answered "constantly." (*Id.*) Dr. Murphy concluded Ms. Harrison could stand or walk for less than two hours in an eight-hour workday and that she would require an unscheduled hour-long break per eight-hour workday due to pain and stiffness. He said she must use crutches. Finally, Dr. Murphy opined that Ms. Harrison could "rarely" carry 10 pounds or less and that her

6

symptoms would result in absences from work of more than four days per month. (R. at 2084–85.)

Ms. Harrison saw Dr. Murphy two more times in 2023 and continued to report ankle pain. (R. at 2088, 2097.) During both visits, her gait was described as "antalgic," with use of "standard crutches." Each time, Dr. Murphy administered a steroid injection to the ankle and again advised her of the likelihood that surgery would be necessary. (R. at 2089, 2098.)   Ms. Harrison next saw Dr. Murphy in April 2024, and again complained of worsening pain and swelling with discoloration around the ankle. (R. at 2133.) Once more, her gait was documented as "antalgic" with use of "standard crutches." (R. at 2133.) Dr. Murphy recommended total ankle arthroplasty but noted that "Pt unable to have TAA because she has a 2 year old and she is caring for her granddaughter. She will purchase CAM boot." (R. at 2134.)

In evaluating Dr. Murphy's opinion, the ALJ largely recounted his findings, except for the conclusion that Ms. Harrison could only rarely lift or carry 10 pounds or less and that her pain is severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. (ALJ's Decision, R. at 1671–72.) The ALJ found that "[o]verall Dr. Murphy's opinions are not persuasive." (*Id.* at 1672.) The ALJ provided the following reasons:

> They are not supported by the treatment received by the claimant or consistent with the overall medical evidence indicating the claimant certainly does have some right ankle pain with swelling and limited range of motion as well as an antalgic gait at times (hence, the less than sedentary residual functional capacity defined in this decision), but her strength, sensation, pulses and reflexes are typically intact. Surgery has been repeatedly recommended with the claimant declining, which may be keeping her symptoms stagnant. In fact, Dr. Jones stated the claimant had a good prognosis with surgery. An AFO with a good shoe was repeatedly recommended, but the claimant does not oblige. She stated she does not use the brace due to swelling, but her doctor told her to follow up with Bionics to adjust her brace for edema. It does not appear the claimant did so.

(*Id*. at 1672 (citations to the record omitted).)

The ALJ assessed Ms. Harrison with the RFC to perform sedentary work[2] with various exertional limitations:

> the claimant can never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; occasionally balance as balancing is defined by the Selected Characteristics of Occupations; occasionally stoop, kneel, crouch, and crawl; no operation of foot controls with the right lower extremity; no exposure to environmental hazards such as high exposed places and moving mechanical parts; no commercial driving; must be able to shift positions between sitting and standing such that she can stand for 5 minutes after sitting for 30 minutes but can remain on task when doing so; she may require the use of a cane or single crutch for prolonged ambulation or ambulating on uneven terrain.

(R. at 28.)

The ALJ posed a hypothetical question to the vocational expert ("VE") based on her RFC findings. The VE testified that there were jobs in the national economy in significant numbers (51,500 jobs) that a hypothetical person with Ms. Harrison's RFC could perform: order clerk, charge account clerk, and call out operator. (R. at 1674.) Over the objection of Ms. Harrison's counsel that the VE's methodology was unreliable, the ALJ accepted the VE's testimony, ultimately finding that Ms. Harrison was not disabled. (R. at 1674–75.)

**D. Discussion**

Ms. Harrison makes two main arguments. She first argues that the ALJ did not provide a logical and evidence-based rationale for disregarding several disabling limitations assessed by

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567. "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983).

8

Dr. Jesse Murphy, her treating podiatrist. These include restrictions on lifting and carrying, the need for unscheduled breaks, the requirement to use two crutches for walking, and constant pain interfering with concentration and attendance. In addition, Ms. Harrison contends that the ALJ wrongly dismissed Dr. Murphy's opinions by drawing an adverse inference from her decision to forgo surgery without considering her stated reasons, and from her inability to wear a prescribed brace.

Second, Ms. Harrison submits that the ALJ's Step Five decision is unsupported because the VE failed to provide a cogent and thorough explanation of a well-accepted statistical methodology for calculating the 51,500 jobs that the ALJ concluded Ms. Harrison could perform. She also maintains that the ALJ's failure to obtain any regional breakdown or probe whether sufficient jobs exist in Ms. Harrison's region or multiple regions constitutes an independent ground for remand.

**(1)** *Dr. Murphy's Medical Opinion*

Under the regulations, an ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The ALJ must explain "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). When considering the persuasiveness of any medical opinion, an ALJ must consider the following factors: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any other factors that

9

tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies. 20 C.F.R. §§ 404.1520(c), 416.920c(c). Supportability and consistency are the two most important factors. 20 C.F.R. § 404.1520c(a). These are the factors the ALJ must explicitly discuss, even though the ALJ need only consider the other factors. 20 C.F.R. § 404.1520c(b). Failure to adequately discuss supportability and consistency requires remand. *See Tammy M. v. Saul*, 2021 WL 2451907, at *7–8 (N.D. Ind. June 16, 2021). The more consistent the medical opinion is "with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive" the medical opinion will be. 20 C.F.R. § 404.1520c(c)(2). For a provider's opinion to be supportable, it must be based on "objective medical evidence and supporting explanations." 20 C.F.R. § 404.1520c(c)(1). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). "At the end of the day, once the administrative law judge properly considers these factors, we must allow that decision to stand so long as the administrative law judge minimally articulated his reasons—a very deferential standard that we have, in fact, deemed lax." *Crowell v. Kijakazi*, 72 F.4th 810, 816 (7th Cir. 2023) (quotation marks and citation omitted).

The Court agrees with Ms. Harrison that the ALJ erred in her evaluation of Dr. Murphy's opinion, warranting a remand. The ALJ stated that Dr. Murphy's opinion is unsupported by the "treatment received," but she fails to explain what that conflict is. And while arguably such an assessment may be consistent with the evidence before the onset date, or even in the first year or two afterward (the Court makes no judgment on this, as such analysis falls within the ALJ's

province), beginning in January 2023, Ms. Harrison has had a steady stream of medical appointments complaining of ankle pain and swelling, receiving steroid injections, and receiving multiple recommendations to have total ankle replacement surgery. In fact, as far as the Court can tell, podiatrist Hardeep Minhas first recommended ankle surgery in November 2021. (R. at 1668.) But Ms. Harrison was "reluctant to have additional surgery due to her recent pregnancy." (*Id.*) Such recommendations continued through her most recent documented visit, with podiatrist Clinton Scott in February 2024, just three months before the hearing.

The ALJ used Ms. Harrison's reluctance to undergo surgery as a basis to discount Dr. Murphy's opinion, implicitly questioning the severity of her pain complaints. At the hearing, the ALJ asked Ms. Harrison why she had not undergone surgery despite the recommendations. She explained that she had no one to care for her two-year-old daughter and her granddaughter, that the recovery was expected to take six months, and that multiple additional surgeries would likely be required. In the decision, the ALJ acknowledged Ms. Harrison's explanation for not undergoing surgery because she had no one to care for her daughter, but did not mention her other reasons or explain why her explanation was insufficient, pretextual, or otherwise inadequate to justify foregoing surgery. Instead, the ALJ stressed that "[s]urgery has been repeatedly recommended with the claimant declining, which may be keeping her symptoms stagnant." She added that "[i]n fact, Dr. Jones stated [Ms. Harrison] had a good prognosis with surgery." (ALJ's Decision, R. at 1672.)

It's long established that "an ALJ may not draw negative inferences from a claimant's failure to seek treatment without first considering the individual's explanation." *McHenry v. Berryhill*, 911 F.3d 866, 873 (7th Cir. 2018) (citation omitted)). This case is no exception. Dr. Murphy opined that, due to her pain, Ms. Harrison would experience constant interference with

11

her attention and concentration, impairing her ability to perform even simple work tasks. This is central to his opinion, and before it can be discounted based on Ms. Harrison's decision to "decline" surgery, the ALJ must explain her reasoning.

In like manner, the ALJ faults Ms. Harrison for not wearing an AFO: "[a]n AFO with a good shoe was repeatedly recommended, but the claimant does not oblige. She stated she does not use the brace due to swelling, but her doctor told her to follow up with Bionics to adjust her brace for edema. It does not appear the claimant did so." (ALJ's Decision, R. at 1672.) For this last proposition, the ALJ cites the medical notes from the March 7, 2023, visit with Dr. Murphy, specifically to the third page. The Court has reviewed the note but sees nothing supporting the ALJ's proposition that Ms. Harrison failed to follow up with Bionics about adjusting the brace. As to the brace, the note states the following:

- "Brace well constructed. Has difficulty wearing brace with edema";
- "Use brace. [Follow up] with bionics to adjust for edema";
- "The patient and I reviewed the patient's existing footwear and discussed its current condition. We also discussed other footwear options."

(R. at 2080.) Whether by themselves, together, or in the context of the entire visit summary, these notations do not support the ALJ's conclusion that Ms. Harrison did not attempt to adjust the brace. On the other hand, Ms. Harrison testified at the hearing that she tried to wear the brace, even had it adjusted to make it bigger, but it still wouldn't work:

Q. . . . Now that said, were you given an ankle brace?

A. Yes.

Q. Are you wearing it today?

A. I cannot wear it because, can I show you? I don't know if my ankle swells up, it's swelling now. If I sit too long, if I stand too long, it swells up like this, like how

12

it is right now. And it don't even fit and it gets uncomfortable and it leaves those things on the side of my ankle because it gets so fat.

Q. So do you mean that when you wear the brace and your ankle swells it leaves like a mark from where —

A. And it's painful.

Q. Okay. And that is painful to you.

A. Yes, ma'am.

Q. Have you told your doctor that —

A. Mm-hmm.

Q. the brace isn't working for you?

A. Yes, ma'am. And then they tried giving me that man-made, what, it's like a shoe, boot thing.

Q. A CAM boot?

A. I don't know if it's called.

Q. Or a C-A-M boot.

A. Something.

Q. That was in your record, which is why I said that.

A. Okay. So maybe that is it. I couldn't even fit it. My ankle won't even go through it. They even adjusted it for me to make it bigger and it don't fit. I just couldn't do it, can't use it.

Q. And have they offered you any alternative to stabilizing your ankle?

A. No, ma'am.

Q. Did you ever wear your ankle brace on —

A. Mm-hmm.

Q. — a regular basis?

A. I tried, yes.

13

>   Q. Okay. For how long?
>
>   A. I tried to do it daily but it was just too — it don't, it just don't work for me. It's too much inflammation.

(R. at 1699–1700.) The ALJ did not consider this testimony, instead concluding (based on the doctor's notes, which say nothing about her compliance) that Ms. Harrison did not "oblige." Because the ALJ did not address whether Ms. Harrison had legitimate reasons for foregoing the proposed treatments, the Court cannot be assured that she had a proper basis for discounting Ms. Harrison's testimony, and, most importantly here, Dr. Murphy's findings that Ms. Harrison was in too much pain to concentrate and maintain attention at work, and that the brace was ineffective for achieving meaningful relief.

The Commissioner argues that the ALJ did not rely solely on Ms. Harrison's decision to forgo surgery or her failure to wear the prescribed brace in discounting Dr. Murphy's opinion. According to the Commissioner, "the opinions were not consistent with the overall medical evidence indicating that while she did have right ankle pain with swelling and limited range of motion and an antalgic gait at times, her strength, sensation, pulses, and reflexes were typically intact." (Def.'s Resp., DE 19 at 9 (citing R. at 1672.) But without further explanation, the Commissioner wants the Court to assume too much. It is not obvious how typically intact sensation and pulses negate a doctor's conclusion that the patient is in great pain, and the ALJ has not supplied that explanation. Nor can the ALJ assume, without more, that normal strength automatically negates pain. *See Giza v. Comm'r of Soc. Sec.*, 2021 U.S. Dist. LEXIS 191895, No. 2:20-CV-263-SLC, 2021 U.S. Dist. LEXIS 191895, at *14–15 (N.D. Ind. Oct. 5, 2021) ("Indeed, even normal gait and muscle strength are not necessarily inconsistent with claims of debilitating pain." (citing *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) ("The administrative law judge said that Adaire was seen to be able to move around 'with ease and had

a normal gait.' In other words, he does not limp. She didn't explain why, if the applicant's evidence of pain were truthful, it would imply that he limps."); *Otis S. v. Saul*, 1:18-CV-372-WCL, 2019 U.S. Dist. LEXIS 225716, 2019 WL 7669923, at *3 (N.D. Ind. Dec. 19, 2019) ("An ALJ's independent reliance on a claimant's muscle strength to depart from a medical opinion regarding such limitations therefore suggests an improper tendency to 'play doctor.'"). Rather than focus on discussing supportability and consistency, the ALJ jumped to unsubstantiated conclusions, in addition to ignoring Ms. Harrison's reasons for foregoing surgery and not wearing the brace.

On remand, the ALJ should not only note Ms. Harrison's explanations for not undergoing surgery and for her failure to wear the brace but also explain how, if at all, those choices undermine the persuasiveness of Dr. Murphy's medical opinion in light of the overall record. And since the case is being remanded, the Court need not address Ms. Stump's other arguments, especially those applicable to step five of the sequential analysis.

### E. Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: September 29, 2025

                                                            /s/ JON E. DEGUILIO
                                                            Judge
                                                            United States District Court